IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES GRUBBS, | ) | CASE NO. 1:17-CV-2616 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff James Grubbs ("Grubbs") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying his applications for

disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"). Doc. 1. This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned

Magistrate Judge pursuant to the consent of the parties. Doc. 9.

For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

## I. Procedural History

Grubbs filed his applications for DIB and SSI in November and December 2013,

respectively, alleging a disability onset date of March 1, 2012. Tr. 161, 173. He alleged

disability based on the following: mental illness, chronic pain, mental problems, and physical

problems. Tr. 311. After denials by the state agency (Tr. 185-186), Grubbs requested an

administrative hearing (Tr. 201).[1] A hearing was held before Administrative Law Judge ("ALJ")

Joseph G. Hajjar on July 13, 2016. Tr. 119-160. At the hearing, Grubbs amended his alleged

---

[1] There is no reconsideration stage in Pennsylvania because it is one of ten states participating in the Social Security Administration's Full Process Model initiative. *See* Social Security Administration, Program Operations Manual System § DI 12015.100, available at https://secure.ssa.gov/poms.nsf/lnx/0412015100.

onset date to June 2, 2013. Tr. 105, 124. In his August 30, 2016, decision (Tr. 105-114), the ALJ determined that there are jobs that exist in significant numbers in the national economy that Grubbs can perform, i.e. he is not disabled. Tr. 113. Grubbs requested review of the ALJ's decision by the Appeals Council (Tr. 266) and, on October 19, 2017, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Grubbs was born in 1967 and was 46 years old on the date his applications were filed. Tr. 270. He has an eleventh grade education, including two years of LPN training in high school. Tr. 126-127, 132. He previously worked as a van driver, tow truck driver, home attendant, general laborer, assembly press operator, store clerk, and business trainer. Tr. 151-154. He last worked in 2012. Tr. 127.

### B. Relevant Medical Evidence[2]

On June 2, 2013, Grubbs went to the emergency room at the University of Pittsburgh's Medical Center complaining of testicular pain for the last two weeks. Tr. 378. He had recently had a vasectomy. Tr. 378, 357, 405. Upon exam, he had swelling of the right testicle and testicular and epididymal tenderness. Tr. 379. An ultrasound confirmed right testicle swelling. Tr. 385. The attending physician diagnosed Grubbs with epididymitis and post-operative pain. Tr. 379.

On January 2, 2014, Grubbs saw his primary care physician in Pennsylvania, Park W. Bateson, D.O. Tr. 405. Grubbs complained of groin pain, increased urinary frequency, anxiety, and depression. Tr. 405. He informed Dr. Bateson that he had had second opinions regarding

---

[2] Grubbs only challenges the ALJ's findings regarding his physical impairments. Accordingly, only the medical evidence relating to these impairments is summarized and discussed herein.

his pain after his vasectomy and was told it could take up to two years to resolve with wearing tight underwear and physical therapy.  Tr. 406.  Grubbs stated that he wore tight underwear while performing his work driving vans.  Tr. 406.  He rated his pain as 10/10 as soon as he starts walking and explained that he has to walk open legged; if he tries to walk normally he gets discomfort.  Tr. 406.  Walking open legged makes it feel better.  Tr. 406.  He was taking Percocet and also had back issues from a work incident in 1997.  Tr. 406.  He had radiculopathy in his lower left extremity and referenced an MRI he had in 2013.  Tr. 406.  He stated that his daughter has cerebral palsy and he lifts her a lot; she weighs 173 pounds.  Tr. 406.  He had stopped taking his Xanax, which had been helping him, because he wanted to wean off his medications.  Tr. 406.  Dr. Bateson gave him the option of pain management.  Tr. 406. Regarding Grubbs' urinary frequency, Dr. Bateson remarked that Grubbs drank a 24-ounce can of beer 4-5 days a week before bedtime.  Tr. 406.  Upon exam, Grubbs was in no acute distress and had a full range of motion in all extremities.  Tr. 409.  Dr. Bateson's impressions were hypertension, anxiety disorder, urinary frequency, depression, and groin pain.  Tr. 409-410.  He refilled Grubbs' medications, ordered lab work, referred him to urology, and recommended a follow-up visit in two weeks.  Tr. 411.

On January 24, 2014, Grubbs saw urologist Suresh Amina, M.D., at the University of Pittsburgh Medical Center.  Tr. 357.  Grubbs stated his abdominal and testicular pain began after his vasectomy.  Tr. 357.  He reported some problems with his back (weakness, numbness, and tingling on his left side) beginning in 2006.  Tr. 357.  Dr. Amina opined that Grubbs may have a disc problem but Grubbs did not think so; he believed the problem was his back and that the vasectomy made his back worse.  Tr. 357.  Dr. Amina observed that Grubbs walked with a cane, which he had reported using prior to his vasectomy.  Tr. 357.  Upon exam, Grubbs was "a little

bit tender in the lower abdomen." Tr. 357. Grubbs opined it was due to his vasectomy "but I [Dr. Amina] do not see any rebound tenderness." Tr. 357. Grubbs' testicles appeared normal with very minimal tenderness and Dr. Aminia stated that he "is very hyperactive with it." Tr. 357. Additionally, he "has not much of weakness and numbness of the lower extremity." Tr. 357. Dr. Amina recommended Grubbs have a urinalysis and lab work and advised he treat his symptoms symptomatically (take hot baths) as he had done before. Tr. 358. He was to return in six months and contact Dr. Amina sooner if he has more trouble. Tr. 358. On January 29, 2014, a renal ultrasound was unremarkable. Tr. 354.

On February 3, 2014, Grubbs returned to Dr. Bateson for medication refills. Tr. 398. He stated that he was worse; "The other day he slipped and hurt himself." Tr. 398. Grubbs relayed that his doctors had been discussing whether his groin pain was caused by his back problems. Tr. 399. The doctors had told him to return in six months and to walk more without his cane. Tr. 399. Grubbs stated that, due to the cold weather, he felt he needed his cane. Tr. 399. His pain medications were helping as were taking hot baths. Tr. 399, 402. His exam findings were normal. Tr. 401-402. Dr. Bateson refilled his medications. Tr. 402.

On March 5, 2014, Grubbs saw Dr. Bateson for a follow-up visit. Tr. 413-414. He relayed that the urologist recommended physical therapy but that he had never tried it. Tr. 414. His goal was to improve to the point that he can ride his bike. Tr. 414. His medication brought his groin pain down from 10/10 to 5/10 and the weather affected his pain. Tr. 414. His exam findings were normal. Tr. 416-417. Dr. Bateson described his groin pain as "comes and goes" and that medication helped. Tr. 417. He continued his medication (Percocet) "for now" and referred him to physical therapy. Tr. 417.

A September 24, 2014, x-ray of Grubbs' lumbar spine revealed spondylosis and L5-S1 degenerative disc disease with suggestion of neural foraminal narrowing. Tr. 427.

On October 14, 2014, Grubbs saw Dr. Bateson for a check-up, stating that he was under a lot of stress from marital issues (his ex-wife and current wife) and his job; he had a lot of pain in his stomach and groin, rated 5-6/10, which were not getting better, "increased urine output," and numbness in his toes and buttocks. Tr. 69, 71. His exam findings were normal. Tr. 72. Dr. Bateson continued his pain medication and stated that he would follow up with Dr. Amina's referral to urology. Tr. 73.

On March 2, 2015, Grubbs returned to Dr. Bateson for a check-up complaining of pain, 9/10, in his leg, foot, groin, stomach and back. Tr. 63. Grubbs reported that he had seen a urologist in August 2014 and he was supposed to have been set up with a specialist in Pittsburgh. Tr. 63. Grubbs reported that he had broken his toe in January when he ran into some boxes while running to one of his children. Tr. 65. He had gone to the hospital after developing foot pain. Tr. 65. His foot still hurt and was swollen and he was keeping it elevated and not driving much. Tr. 65. They had given him crutches. Tr. 65. His groin was painful and he had to wear tight underwear. Tr. 65. He experienced groin pain for two days after intercourse. Tr. 65. His exam findings were normal. Tr. 67. Dr. Bateson continued his pain medications, stating that they helped, referred him to urology, and ordered a foot x-ray. Tr. 68.

On July 2, 2015, Grubbs saw Dr. Bateson reporting pain in his back, left hip/buttock, and left leg. Tr. 38. The pain was dull and 7/10. Tr. 38. The visit was a three month follow-up and Grubbs stated that he had no concerns that day. Tr. 38. He had not seen urology in Pittsburgh yet due to transportations problems and then he was not feeling well and he had been unable to get another appointment. Tr. 40. His groin pain was about the same and better with tight

underwear.  Tr. 40.  He also tried to cut back on drinking liquids as this increased the pressure in his back.  Tr. 40.  His exam findings were normal.  Tr. 42.  He had a lot of stress but still did not want to be treated with medication and would try to find a counselor first.  Tr. 40, 43.

On October 6, 2015, Grubbs saw Dr. Bateson and complained of aching back pain, 7/10.  Tr. 31.  He also reported groin pain and experiencing left leg pain and numbness after driving.  Tr. 31.  Dr. Bateson added gabapentin to his medications and stated that he needed to see urology.  Tr. 31, 36.

On February 4, 2016, Grubbs saw Dr. Bateson for a medication refill.  Tr. 27.  He complained of chronic urinary frequency and Dr. Bateson observed he was on HCTZ, a diuretic used to treat high blood pressure, and that this could cause his problem.  Tr. 27.  His groin pain was no different and he requested an increase in his gabapentin.  Tr. 27.  His exam was normal and Dr. Bateson increased his gabapentin and switched him from HCTZ to lisonpril, noting that his urinary frequency made his groin pain worse.  Tr. 29.

On March 21, 2016, Grubbs was living in Ohio and saw William Ervine, D.O.  Tr. 456-458.  He complained of pain in his low back and groin area.  Tr. 456.  He had been off his medications for seven days.  Tr. 456.  He had agonizing radiating pain into his buttocks that was currently 8/10 and better with medications.  Tr. 456.  It was worse when he sat in a vehicle for over one hour or did too much bending.  Tr. 456.  He had some tingling in his feet and no weakness.  Tr. 456.  Upon exam, he was in no acute distress.  Tr. 458.  He had tenderness to palpation in his lower lumbar area with muscle spasms and decreased flexion.  Tr. 458.  He had normal muscle strength and tone, normal reflexes, and negative straight leg raise testing.  Tr. 458.  Dr. Ervine diagnosed Grubbs with lumbar disc degeneration, lumber radiculopathy,

testicular pain, and hypertension. Tr. 458. He started him on Lyrica, oxycodone, and baclofen. Tr. 458.

On April 18, 2016, Grubbs returned to Dr. Ervine for a follow-up visit. Tr. 451. He stated that his groin and back pain were not doing much better. Tr. 451. He did not like the way his Lyrica made him feel. Tr. 451. His medications and changing positions improved his pain. Tr. 451. He reported having issues with driving for more than 30-45 minutes and having to get up and move and he had "no issues with his activities of daily living ("ADLs"). Tr. 451. His physical exam findings were the same as his prior visit. Tr. 453. Dr. Ervine refilled his oxycodone and added gabapentin. Tr. 455.

On May 13, 2016, Grubbs saw Dr. Ervine for a follow-up and medication refills. Tr. 447. His low back pain now radiated down into his right thigh, rather than his left. Tr. 447. He was trying to stay active and gabapentin helped with his pain. Tr. 447. Changing positions also helped and his pain was made worse by sitting too long and standing and walking too long. Tr. 447. Dr. Ervine increased his gabapentin dosage and advised that Grubbs continue his normal activity as tolerated and avoid bedrest as his symptoms would worsen. Tr. 449-450.

On June 13, 2016, Grubbs saw Dr. Ervine for a follow-up visit and to get a prescription for a TENS machine. Tr. 483. He reported that he was walking around as much as possible. Tr. 483. He still had low back pain and bilateral groin pain radiating into his right leg. Tr. 483. Intercourse made his pain worse. Tr. 483. Medication, changing positions, and Bengay improved his pain. Tr. 483. The increase in gabapentin helped a little. Tr. 483. His pain was worse first thing in the morning, sitting, standing, and walking too long, and intercourse. Tr. 483. He also had some tingling in his feet at times. Tr. 483. He had no issues with ADLs. Tr. 483. His exam findings were the same as his prior visits. Tr. 485. Dr. Ervine increased Grubbs'

gabapentin and ordered a lumbar MRI, referred him for a pain management evaluation, and advised he continue his normal activity as tolerated. Tr. 485-486.

### C. Medical Opinion Evidence

#### 1. Treating Source

Dr. Ervine appeared to have completed one page of a two page physical medical source statement on behalf of Grubbs, sent via fax stamped May 20, 2016, and missing the signature page and date. Tr. 444. In it, he opined that Grubbs could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk two hours total and 15 minutes without interruption; and sit three to four hours total and 15 minutes without interruption. Tr. 444. He could occasionally balance and could rarely climb, stoop, crouch, kneel, and crawl. Tr. 444.

On July 13, 2016, Dr. Ervine completed a second physical medical source statement on behalf of Grubbs. Tr. 476-477. Dr. Ervine opined that Grubbs could lift and carry five pounds occasionally and two pounds frequently; stand and walk 1.5 hours total, 15 minutes without interruption; and sit for four hours total, 30 minutes without interruption. Tr. 476. He could rarely reach, push and pull and could frequently perform fine and gross manipulation. Tr. 467. He could occasionally balance and kneel and could rarely climb, stoop, crouch, and crawl. Tr. 476-477. He needed to alternate between sitting, standing, and walking at-will, needed 1-2 hours of additional unscheduled rest periods, and had pain that causes absenteeism, interferes with concentration, and takes him off-task. Tr. 477.

#### 2. Consultative Examiner

On September 24, 2014, Grubbs saw Aaron Dewitt, D.O., for a consultative examination. Tr. 422. Grubbs complained of sharp back and sciatic pain that radiated to his left leg, rated 8/10, since 2006. Tr. 422. It limits the amount of time he can sit and stand. Tr. 422. He also

complained of groin pain since his vasectomy in 2013. Tr. 422. He reported using a cane and a TENS unit. Tr. 422. He lived with his wife and two sons and was unable to clean, do laundry, shop, or take care of his children because of his back pain and anxiety. Tr. 423. He could shower and dress. Tr. 423. Upon exam, his gait was antalgic and slow and he had a normal stance. Tr. 423. When he used a cane, his gait sped up but it remained antalgic. Tr. 423. He was unable to fully squat. Tr. 423. He needed help sitting on the exam table and rose with difficulty; he did not need assistance changing. Tr. 423. Upon exam, he had tenderness in his lower abdomen, lumbar and upper thoracic spine, 5/5 muscle strength in his upper extremities and 5-/5 in his lower extremities, and decreased sensation in his left foot. Tr. 424. Dr. Dewitt diagnosed back pain, sciatica, groin pain, lower abdominal pain, anxiety, depression, hypertension, asthma, reflux disease, and an antalgic gait. Tr. 425, 427. He opined that Grubbs could occasionally lift and carry up to 10 pounds; sit for 30 minutes at a time without interruption for seven hours total during a workday; and stand and walk for 10 minutes at a time without interruption for 30 minutes total during a workday. Tr. 428-429. He required a cane to ambulate. Tr. 429. He could occasionally reach, handle, push and pull, operate foot controls, climb stairs and ramps, balance, and stoop. Tr. 430-431.

### 3. State Agency Reviewing Physician

On October 1, 2014, state agency reviewing physician Paul Fox, M.D., partially relied on Dr. Dewitt's opinion when opining that Grubbs could lift and carry 10 pounds occasionally, stand or walk for two hours, and sit for six. Tr. 166-168.

### E. Testimonial Evidence

### 1. Grubbs' Testimony

Grubbs was represented by counsel and testified at the administrative hearing. Tr. 121. He lives with his wife and three children. Tr. 125. They live in an apartment with stairs going up to the bedrooms. Tr. 125. Grubbs has a drivers' license and drives to the local market. Tr. 126.

Grubbs last worked in 2012, driving an Amish work crew. Tr. 127. He worked three to five days a week, 12 hours a day, all hours spent driving. Tr. 127. He would also have to hook up and disconnect trailers, requiring him to lift, carry, push or pull about 100 pounds. Tr. 128. Sometimes he would have to move boulders to make a path for his vehicle to go through at the construction sites. Tr. 128. In 2011 he worked for a towing company lifting anywhere from 40 to 100 pounds and spending half the time on his feet and half the time sitting down. Tr. 129. Prior to that he worked as a home health care technician, requiring him to carrying the patient, his daughter, who weighed 150 pounds, and to shovel snow, drive, cook and clean. Tr. 130. He worked as a general laborer, a store clerk and trainer/hiring manager, and also as an assembly press operator, carrying 80 pounds until he got hurt and they gave him a lighter duty job. Tr. 132-136.

When asked what currently prevented him from working, Grubbs stated that he has a lot of lower body pain all the time, both back and groin pain. Tr. 137. He takes blood pressure medication that causes him to urinate frequently and sweat profusely. Tr. 137. He had a vasectomy in 2013 and he still has pain from that surgery. Tr. 137-138. His doctors have told him that he has irreversible nerve damage. Tr. 138. He has pain all the time, sometimes it is excruciating, such as when he overeats. Tr. 138. He cannot drive, ride his bike, or play ball with his boys anymore. Tr. 138. Somedays one of his biggest feats is going up and down the steps. Tr. 138. He also can no longer drive a vehicle with a manual transmission because it puts too

much pressure on his abdominal muscles to press the clutch pedal.  Tr. 139.  He does not lift or carry things.  Tr. 139.  The most he would attempt to lift is a bag or basket of laundry.  Tr. 139. He cannot lift his 3-year old daughter, whom he estimates weighs about 30 pounds.  Tr. 139.  His inability to lift and carry began after his vasectomy.  Tr. 140.  The ALJ asked about a medical record from 2014 wherein Grubbs had stated that he had been lifting his daughter who weighed 173 pounds, and Grubbs explained that he lifted her with the help of his wife and son and that he had hurt himself.  Tr. 140.

On a typical day, Grubbs "let my feet hit the floor until I get feeling in my lower extremities" and then he uses the restroom, showers, and dresses.  Tr. 140.  He helps his wife with as many house chores as he can: folding clothes, vacuuming, and outside work that may involve hanging something with a ladder, but no physical labor.  Tr. 140.  He tries to walk a little farther every day as his physical therapy.  Tr. 141.  He uses a cane "mostly during the school year in the beginning after the vasectomy when the kids were running around" and currently he uses a walker in the wintertime and a cane on Sundays, which are church days, when they are doing a lot of walking.  Tr. 141.  He did not have the cane at the hearing.  Tr. 141.  Church services last about 45 minutes and he splits his time between sitting and standing.  Tr. 142.  He attends church picnics and he will alternate between sitting and standing.  Tr. 142.

Grubbs testified that his back pain and groin pain are two separate issues.  Tr. 147.  His back pain is made worse by sitting, walking too far, and exercise.  Tr. 147.  He tries to have a routine but that includes medication, and he reads the side effects and they are bad for you.  Tr. 147.  When he is in the car for over 20-30 minutes he has to stop and stretch and it gets discouraging.  Tr. 147.  He can walk for between 15 and 30 minutes, but after about 20 minutes he starts to feel a sensation in his groin and a pinch in the middle of his back, and then it is time

to find a place to stretch out.  Tr. 147.  This also happens if he stands for too long.  Tr. 148.  The

pinch in his back works its way down his leg to his knee and he feels it sharply in the left buttock

and his feet go numb.  Tr. 148.  He has no sensation in his feet and he cannot drive.  Tr. 148.

The pain used to go down his left leg but since his surgery it has been going down the right side.

Tr. 148.  He can stand for about 20 to 30 minutes before he needs to sit down.  Tr. 148.  His most

conformable position is lying at a 45 degree angle with support against his back.  Tr. 149.  He

lies this way twice a day for 30 minutes to a half hour.  Tr. 149.  He also has difficulty sleeping

and gets up during the night about three to five times, on average, to urinate.  Tr. 148.  He also

frequently urinates during the day.  Tr. 149.

        In addition to his medications, Grubbs tries to relieve his pain by taking over the counter

medications such as vitamins and juices.  Tr. 149.  His side effects from his medications are

psychological, in that he gets paranoid about long-term opiate use or developing cancer.  Tr. 150.

### 2. Vocational Expert's Testimony

        Vocational Expert ("VE") Gail Kleir testified at the hearing.  Tr. 150-159.  The ALJ

discussed with the VE Grubbs' past relevant work.  Tr. 152-154.  The ALJ asked the VE to

determine whether a hypothetical individual with Grubbs' age, education and work experience

could perform Grubbs' past work or any other work if the individual had the following

characteristics: can perform light work; would need to alternate positions from sitting, standing,

and walking for five minutes every 30 minutes without being off task; can operate foot controls

frequently with the left foot; can occasionally climb ramps and stairs but never ladders, ropes or

scaffolds; can frequently balance and occasionally stoop, kneel, crouch and crawl; can tolerate

occasional exposures to unprotected heights, humidity, wetness, extreme cold and vibration; can

never operate commercial vehicles; is limited to simple, work-related decisions; can have

frequent interactions with supervisors, coworkers and the public; and would be off-task 10% of the time in an 8-hour workday.  Tr. 154-155.  The VE answered that such an individual could perform Grubbs' past work as an assembly press operator and could also perform work as a cashier (838,000 national jobs); ticket seller (3,300,000 national jobs); and order caller (2,800,000 national jobs).  Tr. 155-156.  The ALJ asked the VE if her answer would change if the individual was limited to only two hours of standing and walking and the VE stated that her answer would change and that such an individual could not perform the work previously identified.  Tr. 158.  However, such an individual could perform work as a fruit and beverage order clerk (191,000 national jobs); charge account clerk (191,000 national jobs); and telephone quotation clerk (966,000 national jobs).  Tr. 158.

Next, Grubbs' attorney asked the VE whether her response to the ALJ's first hypothetical question would change if the individual would be off task 20% of the time, rather than 10%, and the VE stated that it would; there would be no jobs for such an individual.  Tr. 159.  Grubbs' attorney asked the VE if the individuals described in any of the ALJ's hypotheticals could perform work if the individual would regularly miss work two or more days a month, and the VE answered no.  Tr. 159.  Grubbs' attorney asked whether the individuals described in any of the ALJ's hypotheticals could perform work if the individuals would need two breaks a day, lasting 30-60 minutes each, in addition to regular breaks, and the VE stated that this limitation would be considered an accommodation and that there would be no work the hypothetical individuals could perform.  Tr. 159.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[3] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy. *Id.*

## IV. The ALJ's Decision

In his August 30, 2016, decision, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2017. Tr. 107.

2. The claimant has not engaged in substantial gainful activity since June 2, 2013, the amended alleged onset date. Tr. 107.

3. The claimant has the following severe impairments: degenerative disc disease, affective disorders, and testicular pain status post vasectomy in 2013. Tr. 107.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 108.

5. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(a) and 416.967(a) except he could frequently operate foot controls with the left lower extremity and balance; occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; and never climb ladders, ropes or scaffolds. He is restricted to occasional exposure to unprotected heights, humidity, and wetness, extreme cold, and vibration, but no commercial driving. He is limited to simple work-related decisions and could have frequent interaction with supervisors, coworkers, and the public. In addition to normal breaks, he would be off task 10% of the time in an 8-hour workday. He would need to alternate positions from sitting, standing, and walking for five minutes after every 30 minutes without being off task. Tr. 109.

6. The claimant is unable to perform any past relevant work. Tr. 112.

---

[3] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq.* The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq.*, corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

7. The claimant was born in 1967 and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. Tr. 113.

8. The claimant has at least a high school education and is able to communicate in English. Tr. 113.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. Tr. 113.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. Tr. 113.

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 2, 2013, through the date of this decision. Tr. 114.

## V. Plaintiff's Arguments

Grubbs challenges the ALJ's decision on two grounds: the ALJ erred because he did not give "good reasons" for assigning limited weight to the opinion of Grubbs' treating physician, Dr. Ervine, and that the ALJ's RFC assessment is not supported by substantial evidence. Doc. 14, pp. 10-15.

## VI. Legal Standard

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor

resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## VII. Analysis

### A. The ALJ did not err when assigning weight to Dr. Ervine's opinion

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2). If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Wilson*, 378 F.3d at 544. In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole. *See* 20 C.F.R. § 416.927(c); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

Grubbs argues that the ALJ erred when he gave only "limited" weight to Dr. Ervine's opinion. Doc. 14, pp. 10-13. To recap, Dr. Ervine submitted an opinion presumptively dated March 2016 that was incomplete because it only had one page, not two; and a second, complete opinion dated July 13, 2016. The ALJ considered Dr. Ervine's opinion as follows:

> As for the opinion evidence, the claimant's treating physician, William Ervine, DO filled out a Medical Source Statement, which appears to be missing the second page at 6F/4. The claimant's representative was contacted prior to the hearing, but the second page of this statement was never submitted. Instead, the medical source filled out a new statement dated July 13, 2016 (7F). The statement at 7F indicates much more significant limitations. For instance, the first report limits him to occasional lifting of 20 pounds and

frequent lifting of 10 pounds, but the other notes occasional lifting of only 5 pounds. He also notes significant limitations in standing/walking of 1.5-2 hours total, and sitting of 3-4 hours total, with rare to occasional postural activities (6F/4; 7F/2). He indicated the claimant would be off task, absent, and would need 1-2 hours of unscheduled breaks per day (7F/3). This opinion is given limited weight, as it is not consistent with the treatment records, including the objective findings and sporadic treatment. Further, there was no explanation given for the increase in the limitations from one statement to the next.

Tr. 112.

Elsewhere in his decision, the ALJ observed that there were no treatment records for two years, from March 2014 to March 2016. Tr. 111; 144-145. He commented that the first treatment note from Dr. Ervine was dated March 2016, at which time Grubbs complained of back and groin pain but also stated that his pain was better with medications, which he had been off for seven days, and worse after sitting in a vehicle for too long or bending too much. Tr. 111. The ALJ recounted that, upon exam, he had tenderness, spasms and decreased lumbar flexion and normal strength, sensation, and negative straight leg raise testing. Tr. 111. He was restarted on some of his prior medications. Tr. 111. The ALJ observed that, at his follow-up visit the next month, he had stopped taking his Lyrica (stating that he did not do well on it) and gabapentin was added and aerobic exercises recommended, and, in his May visit with Dr. Ervine, Grubbs reported that gabapentin helped and his physical exam findings remained the same. Tr. 111. Additionally, the ALJ summed up that Grubbs' records do not contain any significant diagnostic findings; he had sporadic treatment; and his treatment primarily consisted only of medications, observing that no physical therapy records were in his file. Tr. 112.

Grubbs argues that Dr. Ervine's opinion is consistent with and well supported by the record. However, the issue is whether the ALJ's decision is supported by substantial evidence. *See Wright*, 321 F.3d at 614. Here, the ALJ found that Dr. Ervine's opinion (e.g., that Grubbs could only occasionally lift 5 pounds) was not supported by objective findings and concluded

that Grubbs' diagnostic findings were not significant. Tr. 112. Earlier in his decision, the ALJ commented on Grubbs' x-ray showing lumbar spondylosis and degenerative disc disease and remarked that Grubbs regularly had normal exam findings, including normal strength, sensation and negative straight leg raise testing when seen by Dr. Ervine. Tr. 111. The ALJ also explained that Grubbs had reported that he had been lifting his 173 pound daughter, with or without help, and testified that he could lift a bag of laundry. Tr. 110, 112. In other words, Dr. Ervine's opinion was not well supported by clinical and diagnostic techniques and inconsistent with the other substantial evidence in the case record. *See Wilson*, 378 F.3d at 544.

Grubbs argues that the ALJ's description of his treatment as "sporadic" is "simply in error." Doc. 14, p. 11. The Court disagrees. Grubbs focuses on the fact that he saw Dr. Ervine every month from March 2016 until June 2016 and claims that this is not "sporadic." Id. But the ALJ's reference to sporadic treatment is based on the fact that Grubbs has no medical records for a two-year period, from March 2014 to March 2016. Tr. 111, 143-145. Additionally, the ALJ noted that there were no records of a follow-up with a urologist or physical therapy as recommended or with Dr. Bateson, Tr. 110, 111, 112, and that Grubbs repeatedly declined to or failed to follow up with mental health treatment, Tr. 111. His treatment consisted primarily of medications, which Grubbs stated helped his pain. Tr. 112. These are all good reasons explaining the weight the ALJ gave to Dr. Ervine's opinion. *See* 20 C.F.R. § 416.927(c) (the ALJ considers the supportability of the opinion and the consistency of the opinion with the record as a whole); SSR 16-3p ("[I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the

alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record.").

Grubbs argues that one of the ALJ's stated reasons—that Dr. Ervine's second opinion was inexplicably more restrictive than his first, unfinished opinion—is not a good reason. Doc. 14, p. 12. Again, the Court disagrees. The ALJ detailed Grubbs' visits with Dr. Ervine and observed that Grubbs' condition had not worsened and that medication helped his pain. Tr. 111. Thus, it was proper, and reasonable, for the ALJ to doubt the credibility of Dr. Ervine's opinion because the records do not show that Grubbs' condition worsened. If anything, Grubbs' condition stabilized because he got back on his medications, which helped his pain, as the ALJ observed. Tr. 111.

Grubbs submits that the ALJ should have considered the fact that a portion of Dr. Ervine's second opinion was less limited than his first (e.g., Dr. Ervine second opinion stated that Grubbs could sit for 30 minutes without interruption, rather than 15 minutes as he opined before). Doc. 14, p. 12. But the fact remains that Dr. Ervine changed his opinion without explanation, which does not "undermine the ALJ's implied assertion that [Dr. Ervine's assessments] were arbitrary," as Grubbs asserts. Doc. 14, p. 12. Indeed, any unexplained change in Dr. Ervine's opinion undermines the credibility of his opinion, especially given the fact that the changed limitations have no support in Dr. Ervine's treatment notes. Grubbs' assertion that the ALJ exceeded his role and made a medical judgment is also not persuasive. The ALJ did not exceed his role and make a medical judgment; he merely stated, accurately, that Dr. Ervine's second opinion included severe restrictions on lifting and carrying (no more than 5 pounds occasionally, 2 pounds frequently) that had no support whatsoever in the record and were not present in Dr. Ervine's first opinion, dated a few months prior, finding that Grubbs could lift and

carry 10 pounds frequently and 20 pounds occasionally.  Tr. 112.  This was not error.  *See*

*Beltran v. Comm'r of Soc.* 2016 WL 3364923, at *8 (N.D.Ohio June 17, 2016) (internal

inconsistencies among the claimant's treating source's three opinions is a valid reasons to assign

lesser weight to the opinions).

Finally, Grubbs argues that the ALJ did not weigh the factors in 20 C.F.R. § 416.927(c)

because he failed to consider the frequency of the examination and extent of the treatment

relationship.  Doc. 14, p. 13.  This is incorrect; the ALJ remarked that Dr. Ervine treated Grubbs

beginning in March 2016 and he saw him in April, May and June 2016.  Tr. 111.  Although

Grubbs asserts that Dr. Ervine "treated [him] since 2012," Doc. 14, p. 13, there are no other

treatment notes in the record from Dr. Ervine.  Even if Grubbs had seen Dr. Ervine in 2012, he

moved to Pennsylvania and was not treated by Dr. Ervine until his return in March 2016.  The

ALJ did not err by not recognizing a prior treatment relationship that was not evidenced in the

record.  In sum, the ALJ did not err when assessing Dr. Ervine's opinion.

### B. The ALJ's RFC assessment is supported by substantial evidence

Grubbs argues that the ALJ erred when he assessed an RFC that included the lifting and

carrying restrictions of light work (the ability to lift and carry 20 pounds occasionally and 10

pounds frequently).  Doc. 14, pp. 13-14.  In support, he points to Dr. Ervine's opinion stating that

he could lift and carry no more than 5 pounds occasionally.  Doc. 14, p. 14.  He also complains

that the record shows he cannot walk or stand for the amount of time required to do light work.

Doc. 14, p. 14.  But the ALJ did not credit Dr. Ervine's opinion, as detailed above.  And while

true that consultative examiner Dr. Dewitt and state agency reviewing physician Dr. Fox limited

Grubbs to lifting and carrying no more than 10 pounds and standing or walking no more than 2

hours (Dr. Fox) or 30 minutes (Dr. Dewitt) in a workday, the ALJ assigned little weight to these

opinions.  Tr. 112.  He observed that Dr. Fox relied on Dr. Dewitt's opinion and explained that

the record as a whole does not support the degree of limitation that Dr. Dewitt assessed, citing

the facts that Grubbs was independent with his ADLs, helped his wife as much as he could

(doing chores, driving, and taking care of his children (he has 8), including one who has cerebral

palsy), and helped his ex-wife, who had been diagnosed with cancer.  Tr. 112, 108.  In other

words, substantial evidence supports the ALJ's finding that Grubbs could perform the lifting,

carrying, standing and walking restrictions of light work.  Therefore, the ALJ's decision is

affirmed.  *See Jones v. Comm'r of Soc. Sec*., 336 F.3d 469, 477 (6th Cir. 2003) (the

Commissioner's decision is upheld so long as substantial evidence supports the ALJ's

conclusion).

## VIII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **AFFIRMED.**


IT IS SO ORDERED.



Dated: October 18, 2018

*/s/ Kathleen B. Burke*
_____
Kathleen B. Burke
United States Magistrate Judge